IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SAMSON LIFT TECHNOLOGIES, LLC | : | |
| Plaintiff, | : | Civ. No. 09-1590 |
| v. | : | |
| JERR-DAN, CORP. & OSHKOSH, CORP. | : | J. RAMBO |
| Defendants. | : | |

## MEMORANDUM

Before the court is Defendants', Jerr-Dan Corporation ("Jerr-Dan") and OshKosh Corporation ("OshKosh"), motion to partially dismiss Plaintiff's complaint. For the reasons that follow the motion will be granted in part and denied in part.

**I.      Background**

       **A. Facts**[1]

          **1. Parties**

Plaintiff in this case is Samson Lift Technologies, LLC ("Samson"), a Delaware based company with a place of business in Florida. (Compl. ¶ 3.) The first Defendant is Jerr-Dan, a Pennsylvania based corporation, and a leading manufacturer of towing and recovery equipment, including a range of light, medium, and heavy duty carriers and wreckers. (*Id.* ¶ 4.) OshKosh, the

---

[1] When deciding a motion to dismiss all well-pled, factual allegations in the complaint are taken as true. As such, the following facts are taken directly from Plaintiff's complaint.

second Defendant and Jerr-Dan's parent corporation, is based in Wisconsin. OshKosh specializes in designing, manufacturing, and marketing commercial, fire, emergency, and military trucks. (*Id.* ¶ 5.) OshKosh sells to governmental and private entities both domestically and abroad. (*Id.*)

## 2. Licensing Agreement

Sometime in June of 2004, Samson acquired ownership of a patent which related to the "use, manufacture, marketing, advertising, sale, distribution and provision of a [side-loading vehicle retriever]." (*Id.* ¶¶ 1, 15.) A side-loading vehicle retriever ("SLVR") is an advanced piece of tow truck technology which allows a tow truck to pull along side a parked car — as opposed to in-front of or behind — and, by lowering and extending forks can extract the vehicle from the parked spot without any damage to the parked vehicle. (*Id.* ¶ 16.) Although used in other countries for over a decade, this technology has yet to be used in the United States. (*Id.* ¶¶ 1, 15.) Samson acquired a U.S. Patent for this technology; however, it did not have the capability to manufacture it in the United States, as such, Samson set out to find a company in the U.S. that could properly manufacture the SLVR. (*Id.* ¶ 17.)

Sometime in 2003, Samson began negotiations with two major tow truck manufacturing companies — Jerr-Dan and a company named Miller. (*Id.* ¶ 18.) Samson received a manufacturing proposal from each company. The Miller proposal stated that it would manufacture, market, and sell around fifteen SLVRs within one year of entering into the agreement. By contrast, the Jerr-Dan proposal stated that they would manufacture, market, and sell 350 SLVRs, but would require two years to do so. (*Id.* ¶ 19.)

2

Prior to entering into a Licensing Agreement with Samson, Jerr-Dan made specific promises regarding the manufacturing of SLVRs, which included: beginning to manufacture the SLVRs shortly after entering into the Licensing Agreement; statements what SLVRs would be ready for sale by the annual American Towman Exhibition in 2004; assurances that Jerr-Dan had the proper resources to quickly manufacture and distribute SLVRs; statements that Jerr-Dan would actively use its resources to manufacture and distribute SLVRs; and, that after entering into the Licensing Agreement, Jerr-Dan would promptly enter into a Distribution Agreement with Sampson. (*Id.*)

In addition to making specific promises, Samson alleges that Jerr-Dan also withheld relevant information from Samson, specifically, that: it actively wished to exploit its own products; it planned on obstructing the relationship between Samson and Jerr-Dan; it had no plans on making more than a few SLVRs; it never intended for Jerr-Dan staff to receive a commission for the sale of SLVRs; it never intended to form a marketing or sales plan for SLVRs; it planned on sabotaging Samson's marketing by bringing substandard or defective equipment to sales demonstrations; it planned on submitting an application for an SLVR that would compete with Samson's or would use improvements which Jerr-Dan learned of by manufacturing Samson's SLVR. (*Id.* ¶ 20.)

The Agreement contained an exclusivity clause wherein Jerr-Dan promised "to make reasonable efforts to manufacture, advertise, sell and ship" 350 SLVRs within the first two-years, and 350 for every year after that. If Jerr-Dan was unable to meet these targeted goals, Samson was free to turn the exclusive license into to a non-exclusive license and shop around for manufacturers. (*Id.* ¶ 30.)

In addition to the exclusivity clause, was an improvements clause which greatly detailed the rights of each party should any improvements be made on the SVLR's design. (Doc. 24-2, Licensing Agreement, Art. 5, at 6 of 12.) Specifically, any improvements made to the SLVR by Defendants would be the property of Defendants, except that Samson would retain certain non-exclusive rights. (*Id.* at art. 5.1, at 6 of 12.) Defendants were to provide written notice of any improvements made. (*Id.*) Any improvement made by Samson were to be the property of Samson, with Defendants retaining the same rights as they had under the other articles of the Agreement. (*Id.* at art. 5.2.) The improvements clause also contained other provisions not immediately applicable to the causes of action currently before the court.

Based on the representations by Jerr-Dan, and unaware of the omissions, on June 16, 2004, Sampson and Jerr-Dan entered into an agreement (the "Initial Agreement"). (*Id.* ¶ 22.) However, by this time OshKosh had taken over Jerr-Dan and the Initial Agreement had to be modified. These changes were made near OshKosh's principle office in Wisconsin, and involved Sampson's right's to the the SLVR Patent. (*Id.* ¶ 23.) The final license agreement (the "License Agreement") was executed on July 22, 2004. (*Id.* ¶ 24.) This meant that Jerr-Dan had until June of 2006, "to make reasonable commercial efforts to manufacture, advertise, sell and ship" 350 SLVRs. (*Id.* ¶¶ 28, 31.)

### 3. **Failure of the Licensing Agreement**

As is evidenced by the current litigation, the parties' relationship did not go as planned. First, Jerr-Dan failed to have any of Samson's SLVR's ready for the November 2004 American Towman Exhibition as had been previously

promised. (*Id.* ¶ 32.) However, Jerr-Dan did introduce at this show its own tow truck model which had some of the same benefits as Samson's SLVR. (*Id.*) After this missed deadline, Jerr-Dan promised to have a revised time-line for marketing the SLVR by January 2005. (*Id.* ¶ 33.) It is unclear when this revised time-line was released, but when it was it indicated that the SLVR would not be marketable till April 2005.[2] (*Id.* ¶ 33.)

Samson claims that the above events constituted fraudulent misrepresentations due to the following three promises: first, that a product would be available for the November 2004 American Towman Exhibition; second, that a new project plan would be in place in January 2005; third, that a new project plan was not put into place until January or February 2005 and this plan stated that a product would be available for the April 2005 Florida Tow Show. (*Id.* ¶ 34.)

On December 1, 2005, OshKosh filed a provisional application for a patent for a SLVR similar to Samson's. OshKosh's application included pictures of Samson's SLVR. (*Id.* ¶ 36.) Samson contends that Jerr-Dan, and implicitly OshKosh, were required to give written notice to Samson because it involved an "improvement" of Samson's SLVR as defined under the licensing agreement. No such written notice was provided. (*Id.* ¶ 37.)

The first time the product was introduced to the public was on December 3, 2005, at the American Towman Exhibition, after OshKosh had filed for the patent. However, the SLVR was substandard and not marketable. (*Id.* ¶ 35.) In May of 2006, Samson conducted its first SLVR demonstration at the Annual

---

[2] The complaint uses both April 2005 and April 2006 in varying sections. Based on the other dates alleged in the complaint the court assumes that April of 2006 may be a typographical error.

5

Vehicle and Equipment Show in New York. (*Id.* at 40.) Sampson continued to do demonstrations in June of 2006, but discovered that there were many deficiencies with the SLVR that were making it unmarketable. (*Id.*) The problems were finally corrected after extensive talks between Jerr-Dan and Samson, talks which delayed the marketing of the SLVR even more. (*Id.* ¶ 42.)

In addition to the above delay, Samson alleges a plethora of other instances whereby Jerr-Dan violated terms of the Licensing Agreement. (*Id.* ¶¶ 43, 45.) Furthermore, Samson contends that Jerr-Dan violated its pre-Licensing Agreement promise to promptly enter into a Distribution Agreement as provided for in the Licensing Agreement because Jerr-Dan waited two years to do so. (*Id.* ¶ 44.)

Because Jerr-Dan failed to meet the exclusivity requirements provided in the Licensing Agreement by June of 2006, Samson provided notice to Jerr-Dan that is was converting the license into a non-exclusive license. (*Id.* ¶ 45.) At that time, Jerr-Dan had sold only one SLVR in the United States. (*Id.*) In August 2006, shortly after the license became non-exclusive, Jerr-Dan introduced a new product that was similar to Samson's SLVR. (*Id.* ¶ 46.)

Samson alleges that even after the exclusivity agreement was terminated, Jerr-Dan continued to interfere with Samson's ability to effectively market it's SLVR. (*Id.* ¶ 49.) Specifically, Samson contends that in 2007, Jerr-Dan supplied Sampson with a SLVR for presentation to the United States Department of Public Works and Police Department and that this product was faulty and Jerr-Dan knew it was faulty. (*Id.* ¶¶ 50, 51.) This incident, among others, impeded Samson's ability to market its product to various government agencies including the United States General Services Administration ("GSA"). (*Id.* ¶ 52.) Furthermore, Jerr-Dan

is accused of failing to provide accurate pricing data to Samson and potential customers and failing to properly market the SLVRs. (*Id.* ¶ 53.) Samson contends that the false representations continued into 2006 and 2007, and not only hindered Samson's ability to sell its product but also infringed on contracts Samson was trying to negotiate, specifically with GSA.[3] (*Id.* ¶¶ 54, 55, 56.)

Samson argues that if they had known that Jerr-Dan had no intention of performing under the License Agreement, and that OshKosh would aide and abet in this nonperformance, that they would have instead signed a license agreement with Miller. (*Id.* ¶ 57.) In addition, Samson complains that not only were they harmed, "but the public was deprived of a Product that likely would have avoided millions of dollars in repairs for cars damaged by traditional tow trucks." (*Id.*)

On July 5, 2007, Jerr-Dan, acting through OshKosh, filed a patent application which related to the provisional patent application they had filed on December 1, 2005. (*Id.* ¶ 58.) They again did not provide written notice to Samson and also used a picture of the SLVR which Jerr-Dan had manufactured for Samson. (*Id.*)

#### 4. Sales Outside the United States

In March of 2007, Samson became aware that Jerr-Dan planned to ship two SLVRs to the United Kingdom — a territory outside of that authorized by the License Agreement. (*Id.* ¶ 59.) Samson and Jerr-Dan discussed the shipments and agreed that this would be a one time exception to the License Agreement. (*Id.*)

---

[3] This is well after the exclusivity clause in the Licensing Agreement had been terminated by Samson. It is not clear in the complaint if these false representations pertain to the Licensing Agreement or to the Distribution Agreement the parties entered into in 2006. The issue need not be resolved here as these questions would fall under the breach of contract claims, which are not currently before the court.

Subsequently, Jerr-Dan again sent shipments to the United Kingdom and again came to an agreement that this would be a one time shipment. (*Id.* ¶ 60.) After this second shipment, Jerr-Dan continued to send shipments to the United Kingdom, but without Samson's permissions. (*Id.* ¶ 61.)

### 5. OshKosh's Participation

Samson contends that OshKosh aided and abetted Jerr-Dan in purposefully disrupting Samson's marketing and distribution plans. (*Id.* ¶ 62.) In addition, OshKosh interfered with Samson and Jerr-Dan's relationship by forcing Samson to change provisions in the Licensing Agreement before it was finalized, specifically in regard to patent rights. (*Id.* ¶ 63.) Furthermore, OshKosh facilitated the unauthorized shipments to the United Kingdom and was instrumental in filing the patent application which Sampson claims violated the License Agreement. (*Id.* ¶¶ 66, 67.)

## B. Procedural History

On March 18, 2009, Samson filed its complaint, (Doc. 1-1), in the Southern District of New York alleging the following claims against Jerr-Dan: fraudulent inducement, negligent misrepresentation, breach of contract, breach of the covenant of good faith and fair dealing. Samson brought one count of tortious interference with a contract against OshKosh. Finally, Samson brought the following claims against both Defendants: conversion; conspiracy; tortious interference with prospective economic advantage; unfair competition; "prima facie tort"; and "punitive damages." The case was transferred to this court on August 19, 2009. (Doc. 1.) On November 6, 2009, Defendants filed a motion to partially dismiss Samson's complaint (Doc. 23) and on November 10, 2009, a brief in

support. (Doc. 24.) On January 20, 2010, after two requests for a continuance by Samson, a brief in opposition was filed. (Doc. 29.) On February 8, 2010, Defendants filed their reply brief. The motion is now ripe for disposition.

**II.** **Legal Standard**

When presented with a motion to dismiss for failure to state a claim, the court is required to conduct a two-part analysis. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). First, "the factual and legal elements of the claim should be separated," the court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Id.* Second, the court must determine "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Ashcroft v. Iqbal*, ___U.S.___, 129 S. Ct. 1937, 1950 (2009)).

The complaint must do more than allege the plaintiff's entitlement to relief; it must "show such an entitlement with its facts." *Fowler,* 578 F.3d at 211 (citations omitted). As the Supreme Court instructed in *Iqbal*, "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 129 S. Ct. at 1950 (quoting Fed. R. Civ. P. 8(a) (alterations in original).) In other words, a claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements do not suffice." *Id*.

"To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (citations omitted); *see also Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007). The court may consider "undisputedly authentic document[s] that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] document[s]." *Pension Benefit*, 998 F.2d at 1196. Additionally, "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered." *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 560 (3d Cir. 2002) (citation omitted); *see also U.S. Express Lines, Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002) ("Although a district court may not consider matters extraneous to the pleadings, a document *integral to or explicitly relied* upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment.") (internal quotation omitted). However, the court may not rely on other parts of the record in making its decision. *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994).

### III.     Discussion

Plaintiff argues that Defendants are liable in both tort and contract for the representations they made regarding the production and marketing of Samson's

SLVR design.  Defendants counter that, although Samson may have a breach of contract claim, all the tort claims actually sound in contract and must be dismissed.  Or, alternatively, that depending on which state law controls, certain tort causes of action do not exist or are barred by the applicable statute of limitations.  For the reasons, that follow, the court will grant in part and deny in part Defendants' motion.

### A.  Samson's Fraud Claims

Samson brings one claim of fraudulent inducement against Jerr-Dan for knowingly making false representations or withholding relevant information between 2004 and 2007.  Jerr-Dan counters that claims for fraud must be pled with specificity, which Samson has failed to do in this instance.  In addition, even if sufficiently pled, they are precluded by the applicable state statute of limitations or the economic loss doctrine.  The court agrees that Samson has failed to plead fraud with particularity as required by the Federal Rules.

Federal Rule of Civil Procedure 9 requires that a party bringing a claim for fraud "must state with particularity the circumstances constituting fraud . . . ."  Fed. R. Civ. Pro. 9(b).  However, facts regarding an individual's state of mind may be pled generally.  *Id.*

Plaintiff's complaint alleges that Jerr-Dan made various representations during the period from 2004 thru 2007.[4]  The complaint does not indicate specific

---

[4] This statement included promises that they would meet output requirements and would beginning manufacturing SLVR's shortly after entering into the contract.  (Compl. ¶ 19.)  Also, that the SLVR would be ready for the 2004 American Towman Exhibition.  (Compl. ¶ 19(a).)  And statements that production of SLVRs was a high-priority and Jerr-Dan had the capacity to produce them diligently and timely.   (Compl. ¶ 19 (b-c).)  Jerr-Dan also allegedly promised to use its distribution network to
(continued...)

dates, or who from Jerr-Dan made these statements. However, in Plaintiff's brief in opposition to Defendants' motion to dismiss, Plaintiff makes mention of statements made by "Jeff Weller" and "senior management" indicating that Plaintiff has *some* additional information not alleged in the complaint which would put Defendants on notice of who made fraudulent statement and when they were made. Plaintiff has respectfully requested leave to amend the complaint should the court find that the fraud claims lack particularity. Accordingly, the court will grant Defendants' motion to dismiss Plaintiff's fraud claims but also grant Plaintiff's leave to amend.[5]

### B. Samson's Other Tort Claims

Samson also brings claims for negligent misrepresentation, conversion, tortious interference with contract, conspiracy, tortious interference with prospective economic advantage, unfair competition, prima facie tort, and punitive

---

[4](...continued) market the products and to enter into a Distribution Agreement shortly after joining the License Agreement. (Compl. ¶ 19 (d-e).) Samson claims that Jerr-Dan failed to disclose that it planned on competing with Samson by marketing its own product and by failing to pay any royalties to Samson for the SLVR. (Compl. ¶ 21.) After the agreement was in place, Samson claims Defendants made fraudulent statements regarding when a project plan would be implemented and when the SLVR would be available for show. (Compl. ¶ 34.) Finally, Samson claims that Jerr-Dan lied about planning on hiring more people for the sale of SLVRs and that it facilitate in the hiring of demonstrators for the product. (Compl. ¶ 54.)

[5] Because Plaintiff's complaint lacks specificity regarding when the fraudulent statements were made or who made them, the court will grant leave to amend. However, Plaintiff should note that the fraudulent inducement must be shown to be separate and distinct from the terms of the contract, otherwise, as explained below, it will fail along with Plaintiff's other tort claims under the economic loss doctrine. Plaintiff must allege facts separate and distinct from the breach of contract. *See Werwinski v. Ford Motor Co.*, 286 F.3d 661 (3d Cir. 2002); *Taylor v. Maness*, 941 So.2d 559 (Fla. Dist. Ct. App. 2006); *Dantzler Lumber & Export Co.*, 751 So.2d 137 (Fla. Dist. Ct. App. 2000); *D.S. Am. (E.), Inc. v. Chromagrafx Imaging Sys., Inc.*, 873 F. Supp. 786 (E.D.N.Y. 1995).

damages.[6] Defendants claim that all of Plaintiff's tort claims are barred by either the gist of the action doctrine, or the economic loss doctrine. The court agrees that Plaintiff's tort claims are barred by the economic loss doctrine.

### 1. Choice of Law

New York procedural law governs this case as that is where the complaint was originally brought. However, when analyzing tort claims, federal courts must apply the substantive law of the applicable state. Here the parties spend much time debating which state substantive law should apply — Pennsylvania, Florida or New York. However, this determination need only be made if there is an actual conflict between the laws of the states in question. Therefore, where no material difference in state substantive law exists, the court need not determine which state law to apply. *Elgin Sweeper Co. v. Melson Inc.*, 885 F. Supp. 641, 648 (N.D.N.Y 1995). Here, the court finds that the economic loss doctrine applies to Plaintiff's tort claims and that there is no material difference in this doctrine as it is applied in Pennsylvania, Florida or New York.

### 2. Economic Loss Doctrine

Under the "economic loss doctrine," a plaintiff may not recover in tort for what is otherwise an allegation sounded in contract. This is especially true when there is no personal injury or property damage. *Werwinski v. Ford Motor Co.*, 286

---

[6] The claim for punitive damages will be dismissed for two reasons. First, it is unclear to the court whether this is to be considered a separate "claim" or whether Samson merely wishes to recover punitive damages under the other tort claims. Regardless, Samson spends much time discussing the various ways the public may have been potentially harmed by the SLVR not being placed on the market for a period of years. Samson claims that the public could possibly have avoided millions of dollars worth of damage and accidents. (Compl. ¶¶ 68-73.) The court fails to see how this is relevant to Samson's complaint as the "public" is not a party to this action, and Samson may not recover on any speculative harm the "public" may have sustained.

13

F.3d 661, 671 (3d Cir. 2002) (interpreting Pennsylvania law); *Reilly Foam Corp. v. Rubbermaid Corp.*, 206 F. Supp. 2d 643, 658 (E.D. Pa. 2002) (same); *Indemnity Ins. Co. of N. Am. v. Am. Aviation, Inc.*, 891 So.2d 532, 536 (Fla. 2004); *Fl. Power & Light Co. v. Westinghouse Elec. Corp.*, 510 So.2d 899 (Fla. 1987); *Ignazio Messina & C.S.P.A. v. Ocean Repair Serv. Co.*, 1991 WL 116336, at *3 (S.D.N.Y 1991) (interpreting New York law); *City of Kingston Water Dep't v. Charles A. Manganaro Consulting Eng'r*, 2003 WL 355763, at *3 (N.D.N.Y. 2003) (same). When the loss of a product's value is at issue, express and implied warranties under contract law are the proper way to remedy such injuries. *Werwinski*, 286 F.3d at 671. "Not only would allowing an action to lie in tort impose substantial costs on society, but relying on contract law permits parties to negotiate the terms of the manufacturer's liability." *Id.* (citing *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858 (1986). Furthermore, "it is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has be violated." *City of Kingston Water Dep't*, 2003 WL 355763, at *3.

Here, Plaintiff has failed to point to any legal duty Defendants owed which arose outside of the obligations contained in the contract.

In fact, both Samson's complaint and the brief in opposition to the instant motion are replete with citations to the actual contracts. For instance, Samson alleges that Defendants made material representations and omissions regarding their plan to hinder the manufacturing and marketing of Samson's SLVR, including failing to train or assign personnel to make and market Samson's SLVR. (*See* Compl. ¶¶ 19, 54.) In addition, Samson claims that Defendants marketed their

14

own product, which was similar to Samson's, at the expense of Samson's SLVR.
Assuming that these allegations are true, they could be covered under the following
provisions of the Licensing Agreement:

> LICENSEE warrants to make reasonable commercial efforts to manufacture, advertise, sell and ship the Licensed Products, and shall continuously and diligently during the term of this Agreement procure and maintain facilities and trained personnel sufficient and adequate to accomplish the foregoing, all to the extent and in a manner no less thorough, diligent, and professional than the same accorded to LICENSEE for LICENSEE's other products. LICENSEE shall manufacture or cause the manufacture of the Licensed Products in accordance with the SAMSON Patent Rights, in compliance with all applicable laws, and with good manufacturing procedures at least consistent with (if not superior to) the manufacturing of its other products.

(Doc. 24-2, Licensing Agreement, Art. 8.2, at 8 of 12.) This paragraph is in addition to Article 3.3 which governs the parties' rights if Defendants fail to make reasonable efforts to meet the exclusivity requirements in the contract.

Plaintiff's negligent misrepresentation and conversion claims similarly sound in contract rather than tort. Samson states- "[b]ecause of the nature of the transactions between the parties *created by the Licensing Agreement*, Jerr-Dan and Samson were engaged in a special relationship . . . ." (Compl., ¶ 85.) As for its conversion claim, Plaintiff argues that Defendants converted their property by selling and marketing the SLVR outside the United States in violation of the contract. (*Id.* ¶ 99.)

### 3. Tortious Interference With Economic Advantage and Unfair Competition

Similarly, Samson's claims for tortious interference with economic advantage and unfair competition also arise solely out of obligations imposed upon

15

Defendants under the terms of one or both of the Agreements. The alleged interference is that Defendants "used dishonest, unfair, or wrongful means to cause" Samson to lose business relations with Miller and "government agencies such as the GSA." (*Id.* ¶¶ 115, 117.)

Concerning the prospective business relations with Miller, these potential relations were over once Samson entered into the Licensing Agreement with Defendants on July 22, 2004. Samson was free to negotiate the terms of the contracts it was considering entering into with both Defendants and Miller. Samson argues that Defendants made false promises about their marketing and output capabilities which caused Samson to enter into an agreement with Defendants instead of Miller. Although the court recognizes these promises were made before the actual contract was in place, it remains unclear how the contract fails to provide the appropriate remedy. Samson was free to negotiate between Miller and Jerr-Dan, Samson chose to enter into a contract with Jerr-Dan and as a result was free to negotiate whatever terms Samson desired. To determine that Defendants misrepresentations constitute tortious interference with prospective business relations would turn the contract bidding process on its head. Everyday companies make representations concerning their capabilities, that is the process by which contracts are awarded. If Defendants made misrepresentations this would be covered in a fraud claim or by a showing that by not performing as promised they breach the contract. Samson was free to shop around companies and accept the bid which best fit within its interest. Samson did just that and chose to enter into an agreement with Defendants. Any misrepresentations allegedly made by Defendants were either fraudulent, in which case Samson has already been permitted to amend

16

the complaint, or were a breach of the contractual obligations, which claims are not currently before the court.

As for the claims with regard to GSA and "other governmental agencies," the only allegations are that Defendants either failed to timely provide products for display or provided deficient products. Because both of these claims would be a violation of the Licensing Agreement, they are best addressed as breach of contract claims, which at this stage of the litigation is not ripe for disposition.[7]

## IV.     Conclusion

For the aforementioned reasons, Defendants' motion will be granted, although Plaintiff will be permitted to amend the complaint to plead the fraud claim with particularity and if it can be established that the fraud was wholly independant of the contract. Defendants' motion will be granted as to Samson's second, fifth, seventh, tenth and eleventh claims for relief, as these claims fail under the economic loss doctrine. Plaintiff's eighth and ninth claims for tortious interference with economic advantage and unfair competition will be dismissed because they fail as a

---

[7] Neither party addresses the tortious interference with contract claim. Although it is apparent that this claim, like the other tort claims, is barred by the economic loss doctrine, because the claim also fails on its face, in the interest of judicial economy the court will address it here. Because all three jurisdictions in question have substantially the same requirements for a claim of tortious interference with contract, the court again, need not address which one specifically applies. Generally, to establish such a claim, a plaintiff must show: "1) an existing or prospective contractual relationship; 2) purposeful action designed to harm or prevent such a contract; 3) absence of a privilege or justification; and, 4) legal damages." *PSC INFO Group v. Lason, Inc.*, 2010 WL 411095, at *13 (E.D.Pa. 2010) (recognizing that a parent corporation is privileged to interfere in the prospective contracts of its subsidiary); *see Int'l Funding Corp. v. Krasner*, 360 So.2d 1156, 1157 (Fla. Dist. Ct. App. 1978); *see generally Foster v. Churchill*, 87 N.Y.2d 744, 749 (N.Y. 1996) (establishing economic justification as a defense to tortious interference with contract claims). In this case, OshKosh, as the parent corporation of Jerr-Dan was justified in interfering with any potential contract between Jerr-Dan and Samson, and, therefore, the claim fails as a matter of law.

matter of law, such claims as presented constitute either fraud or a breach of contract. Plaintiff's sixth claim for tortious interference with contract will be dismissed by the court for judicial economy because, as a matter of law, the claim fails under both the economic loss doctrine and because Samson has failed to establish that there was no justification on Osh-Kosh's part as the parent company of Jerr-Dan. An appropriate order will issue.

S/ SYLVIA H. RAMBO<br>United States District Judge

Dated: March 22, 2010.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SAMSON LIFT TECHNOLOGIES, LLC | : | |
| Plaintiff, | : | Civ. No. 09-1590 |
| | : | |
| v. | : | |
| | : | |
| JERR-DAN, CORP. & OSHKOSH, CORP. | : | J. RAMBO |
| Defendants. | : | |

## ORDER

In accordance with the accompanying memorandum of law Defendants' motion will be **GRANTED**. However, Samson will be permitted leave to amend its complaint as to the claim for fraudulent inducement if it can be established that the fraud was wholly independent of the contract.

Although not briefed, Samson's sixth claim for tortious interference with contract will be **DISMISSED** for judicial economy because it fails as a matter of law.

S/ SYLVIA H. RAMBO
United States District Judge

Dated: March 22, 2010.