## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SAMSON LIFT TECHNOLOGIES, LLC, | : | |
| Plaintiff | : | Civ. No. 09-1590 |
| | : | |
| v. | : | |
| | : | |
| JERR-DAN CORPORATION, | : | J. RAMBO |
| Defendant | : | |

## **MEMORANDUM**

Before the court is Plaintiff's motion for partial summary judgment on liability on its breach of contract claim.[1] (Doc. 72.) For the reasons that follow, Plaintiff's motion will be granted in part and denied in part.

## I. **Background**[2]

On June 4, 2004, Plaintiff, Samson Lift Technologies, LLC ("Samson") acquired ownership of a patent that related to the "use, manufacture, marketing, advertising, sale, distribution and provision of a fork lift apparatus adapted to be

---

[1] Plaintiff has also brought a breach of the covenant of good faith and fair dealing claim but has not moved for summary judgment on that claim, as such, it will proceed to trial.

[2] In *Forbes v. Twp. of Lower Merion*, 313 F.3d 144, 148–49 (3d Cir. 2002), the Third Circuit reaffirmed its supervisory rule first announced in *Vadino v. A. Valey Engineers,* 903 F.2d 253, 259 (3d Cir.1990) that "the district courts in this circuit [must] accompany grants of summary judgment hereafter with an explanation sufficient to permit the parties and this court to understand the legal premise for the court's order." *Vadino*, 903 F.2d at 259. Here, the court will identify those facts that are subject to genuine dispute, and cite to the record in order to highlight the precise nature of any disputed facts. The court will not cite to the record where the facts are undisputed; instead, the court will rely on the statements of material fact and admissions submitted by the parties. The materiality of any genuinely disputed facts will be analyzed in the discussion section below.

coupled to a truck or trailer." (Pl.'s Statement of Material Facts ("SMF") ¶¶ 1, 3.) The parties and the court have generally referred to this piece of equipment as a side-loading vehicle retriever ("SLVR") because it allows a tow truck to pull along side a parked car — as opposed to in-front of, or behind — and, by lowering and extending forks can extract a vehicle from a parked spot without any damage to the parked vehicle. Although Samson acquired a U.S. Patent for this technology, it did not have the capacity to manufacture the SLVR in the United States. Therefore, Samson searched for a manufacturing company with appropriate resources and marketing abilities to manufacture the SLVR.

By late 2003, Samson considered two companies, Jerr-Dan and Miller, to be the front runners. For financial and marketing reasons, Samson chose to enter into a licensing agreement with Jerr-Dan. During the process of negotiating the terms of the licensing agreement, discussions also took place concerning entering into a distributor agreement. However, the parties greatly contest whether conversations merely took place, or actual promises were made to enter into a distributor agreement. (Pl.'s SMF ¶ 16 (citing to a number of emails and other correspondence that Samson argues constitute promises by Jerr-Dan representatives to enter into a distributor agreement immediately after signing the license agreement); Def.'s SMF ¶ 16 (citing the deposition of Jerr-Dan representative Jeff Weller stating that "he could not recall agreeing to 'do a distributor agreement immediately upon signing the license agreement.'").)

On June 16, 2004, the parties executed an initial license agreement. A representative of Samson stated that the agreement was entered into based on Jerr-Dan's alleged promise that a distributor agreement be entered into promptly. (Pl.'s

SMF ¶ 17.) Defendants cite to the deposition of Jeff Weller, a representative of Jerr-Dan, to rebut this claim. (Def.'s SMF ¶ 17.) Subsequent to the execution of the initial license agreement being entered into, Defendant OshKosh Corp. ("OshKosh") acquired Jerr-Dan. Samson claims that after this acquisition, Jerr-Dan and OshKosh demanded changes to the initial license agreement, including changes regarding patent protection and disclosure. (Pl.'s SMF ¶ 18.) On July 22, 2004, the final License Agreement was signed by all parties.[3] (Pl.'s SMF ¶ 19.)

Samson claims that the License Agreement contains the following specific promises by Jerr-Dan: exclusivity targets would be set at 350 SLVR's for the period from the agreement's inception through June 30, 2006 and each twelve month period thereafter (Pl.'s SMF ¶ 20)[4]; Jerr-Dan would "'continuously and diligently procure' and maintain facilities and trained personnel adequate to make reasonable commercial efforts (Pl.'s SMF ¶ 22(a), the "Resource Promise"); Jerr-Dan would "do the foregoing in a manner 'no less thorough, diligent, and professional' than Jerr-Dan would with its other products" (Pl.'s SMF ¶ 22(b), the "Non-Discrimination Promise"); "Jerr-Dan promised to sell the Samson Product only in United States" (Pl.'s SMF ¶ 24(a), the "Territorial Restriction" promise); and that the License Agreement contained a patent protection clause whereby Jerr-Dan would inform Samson if it applied for a patent for any "Improvements" to the SLVR during

---

[3] Plaintiff has attached the License Agreement as Exhibit 3 to its motion and repeatedly cites to this document as the License Agreement. Defendants do not refute that this document is the License Agreement that all parties entered into. However, the court notes that the attached document is dated June 16, 2004, not July 22, 2004. (*See* License Agreement, Ex. 3, Doc. 73-3.)

[4] Jerr-Dan does not contest the exclusivity targets outlined in the Licensing Agreement, however, Jerr-Dan does point out that the agreement contemplated for adjustments in the targets based on "reasonable market conditions." (Def.'s SMF ¶ 20.)

the applicability of the License Agreement.  (Pl.'s SMF ¶ 24(b), the "Patent Promise.")

On February 14, 2006, the parties entered into a Distributor Agreement. (Doc. 73-11, Ex. 3, Distributor Agreement.)  Under the Distributor Agreement, Jerr-Dan was obligated to: train employees and representatives in the general use of the SLVR[5] and, Jerr-Dan was to provide, "upon [Samson's] request and upon mutually agreed upon terms, . . . reasonable assistance during major sales presentations to governmental representatives."  (Pl.'s SMF ¶ 25; Def.'s SMF ¶ 26; Pl.'s SMF ¶ 26, the "Support Promise.")

Samson claims that the above alleged "promises" were incorporated into the Agreements, and thus actionable under contract law.  (Pl.'s SMF ¶¶ 27, 29.)  Jerr-Dan disputes that any such "promises" were incorporated into either the License Agreement or Distributor Agreement and thus also disputes that they are actionable under these contracts.  The facts and evidence in record — inluding depositions, declarations and affidavits from various employees of the respective companies — diverge greatly with regard to what "promises" or "representations" were made during the course of negotiating both the Licencing Agreement and Distributor Agreement. (*See* Amend. Compl. ¶¶ 45, 46, 47, 48, 49, 57, 59, 61, 61, 63, 71; Decls. Baish, Anderson, D'Angelo, Joel Amsley, Kuriakose, Wasserman, Anderson, Gelbart; Deps. Joel Amsley, Karen Seylar Amsley, Weller, Blankenfeld, Kuiakose, Hammond, Saffelle, Chiaramonte, Surace, D'Angelo, Carberry, Smith, Walter, Aiken, Rutenberg, Lazarus, Anderson, Gelbart, Kimmitt, Badgley, Szews.)

---

[5] Although the number of individuals to be trained was to be at Jerr-Dan's "sole discretion," at least a total of three (3) employees of Samson were to be trained at no additional cost.

Although the parties generally agree that a Licensing Agreement and a Distribution Agreement were entered into, they dispute the intent of the parties regarding some of the language contained in the Agreements. The parties also dispute at what point subsequent to the signing of the Licensing Agreement the Distribution Agreement was to be entered into. Finally, perhaps the largest contention between the parties pertain to whether or not Jerr-Dan made "reasonable commercial efforts" to market the SLVR in a manner consistent with it other products. The court will discuss each "promise" in turn.

## II.     Legal Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001). A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the nonmoving party. *Id.* at 248. The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. *Saldana*, 260 F.3d at 232; *see also Reeder v. Sybron Transition Corp.*, 142 F.R.D. 607, 609 (M.D. Pa. 1992).

The moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324

(1986). Upon such a showing, the burden then shifts to the non-moving party to present "specific facts showing the existence of a genuine issue for trial." Fed. R. Civ. P. 56(e). The nonmoving party may not simply sit back and rest on the allegations in its complaint; instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324 (internal quotations omitted); *see also Saldana*, 260 F.3d at 232 (citations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322-23. "'Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance.'" *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

Because subject matter jurisdiction in this case is based on diversity of citizenship, the court looks to the substantive law of Pennsylvania to determine the rights and obligations of the parties. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 77 (1938). The law of the Commonwealth is declared by "its Legislature in a statute or by its highest court." *Id*. The Pennsylvania Supreme Court is the best authority on Pennsylvania law, but when the Supreme Court has not issued a clear pronouncement in a particular area, the court "must consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data" to determine what the law is. *McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657, 661, 663 (3d Cir. 1980); *see also Comm'r v. Estate of Bosch*, 387 U.S.

456, 465 (1967). Opinions from lower Pennsylvania courts are not controlling, but they are entitled to significant weight when there is no indication that the Pennsylvania Supreme Court would rule otherwise.

### III. Discussion
#### A. Individual Alleged Promises by Jerr-Dan
##### 1. Non-Discrimination Promises

Section 8.2 of the Licensing Agreement state as follows:

> [Jerr-Dan] warrants to make *reasonable commercial efforts* to manufacture, advertise, sell and ship the [SLVR], and shall continuously and diligently during the terms of this Agreement procure and maintain facilities and trained personnel sufficient and adequate to accomplish the foregoing, *all to the extent and in a manner no less thorough, diligent, and professional than the same accorded to [Jerr-Dan's] other products*. [Jerr-Dan] shall manufacture or cause the manufacture of the [SLVR] in accordance with the SAMSON Patent Rights, in compliance with all applicable law, and with good manufacturing procedure at least consistent with (if not superior to) the manufacture of its other products.

(Pl.'s Ex 3, Doc. 73-3, Licensing Agreement, § 8.2) (emphasis added).

Samson claims that, as a matter of law, Jerr-Dan breached this provision by: engaging in pricing discrimination by failing to include the price of the SLVR in various price books and instead listing the price as "TBD (to be determined"); delaying the relay of the listed price of the SLVR to Samson and subsequently providing an incorrect price; failing to demonstrate the SLVR in a similar fashion to other Jerr-Dan products; engaging in market discrimination by failing to target high-profile Northeast Regions as originally agreed to; and finally, engaging in commission discrimination by providing minimal, if any, sales commission for the

marketing and sale of an SLVR.  (Pl.'s Br. Supp. Mot. for Summary Judgment, pp. 11-15.)

Before rebutting these contentions, Defendants take note that all of Plaintiff's "non-discrimination" allegations involve Defendants' contractually obligated duty under Section 8.2 of the License Agreement to make "reasonable commercial efforts" with the SLVR just as it would when manufacturing, advertising, selling, or shipping Jerr-Dan's other products.  (*See* Doc. 73-3, Licensing Agreement, § 8.2.)  Although the court will address each of the "promises" individually, the court first notes that "reasonable commercial efforts" is an ambiguous term open to multiple interpretations.  Therefore, it is a factual determination best left for a jury to decide.  *See Huang v. BP Amoco Corp.*, 271 F.3d 560, 565 (3d Cir. 2001) ("Under Pennsylvania law, whether a party has made a good-faith effort is a question of fact."); *In re Am. Home Mortg. Holdings, Inc.*, 637 F.3d 246, 259 (3d Cir. 2011) (Rendell, J., concurring) ("the determination of what is 'commercially reasonable' involves a fact-intensive inquiry, dependant of the totality of the circumstances, and calls for an examination of the particular situation . . . ."); *1000 N. of N.Y. Co. v. Great Neck Med. Assocs.*, 775 N.Y.S.2d 884, 885 (N.Y. 2004) (explaining that whether a party had used "reasonable commercial efforts" required a factual determination and therefore was not appropriate to be resolved as a matter of law).  Therefore, not only is the issue of whether Jerr-Dan made the alleged promises a factual determination, it is also well-established that whether Jerr-Dan used "reasonable commercial efforts" to fulfill these promises is an issue for a jury to decide.

In short, the court concludes that the question of whether Jerr-Dan fulfilled its contractually obligations is best left to a jury and thus summary judgment will be denied on this ground. Nevertheless, the court will briefly discuss each alleged promise.

### a. Pricing Discrimination

Samson claims that Jerr-Dan engaged in pricing discrimination because it failed to list the specific price of the SLVR in the 2006 and 2007 price books and instead indicated the price was "TBD (to be determined)." In addition, the SLVR was not listed at all in the 2008 price books. However, although Jerr-Dan conceded this general point, it claims that the SLVR was merely a proto-type for most of 2006 and that once a pre-production model was available, Jerr-Dan supplied pricing through inventory sheets, email, upon request or on Jerr-Dan's website. (*See* Def.'s Br. in Opp. to the Mot. for Summ. J., at 12.) In addition, Samson alleges, and Jerr-Dan agrees that there was a mistake in the pricing information that was given to Samson in January 2007, an error that was not corrected until October 2007. It is therefore apparent that whether or not pricing discrimination occurred will require an inquiry into whether Jerr-Dan made "commercially reasonable efforts" to provide pricing for the SLVR, a factual determination to be decided by a jury. Summary judgment on this ground will be denied.

### b. Demonstration Discrimination

In addition, Samson claims that Jerr-Dan engaged in demonstration discrimination because it only demonstrated the SLVR to a maximum of twenty-five potential customers, while it demonstrated another product, the MPL-40, to up to one thousand potential customers. Jerr-Dan claims the products are not comparable given the well-established popularity of the MPL-40 and the relatively new technology which was the SLVR.

Again, it is for a jury to determine the factual issue of whether these products are similar enough in nature to constitute being comparable as one of Jerr-Dan's "other products" (*see* Licensing Agreement, § 8.2, "[Jerr-Dan] must manufacture . . . the [SLVR] . . . with good manufacturing procedures at least consistent with (if not superior to) the manufacture of its other products"), and whether Jerr-Dan acted with "reasonable commercial efforts" given the relatively new design of the SLVR. Summary judgment on this ground will be denied.

### c. Marketing Discrimination

Samson claims Jerr-Dan participated in marketing discrimination because the sales manager for Jerr-Dan was unfamiliar with the marketing scheme Samson and Jerr-Dan agreed upon, and that Jerr-Dan advanced the marketing of other similar products, but failed to do so for the SLVR. Both parties cite to various depositions or declarations for support, each of which is open to interpretation and credibility determinations. (*See* Marketing Plan, Pl.'s Ex. 10; Dep. Amsley, Hammond, Seylar; Dec. Anderson.) Therefore, a jury must make the factual determination regarding what the relevant individuals involved in marketing did or did not do to advance the marketing of the SLVR as compared to other similar

products marketed by Jerr-Dan and whether the effort that was made was "commercially reasonable." Summary judgment on this ground will be denied.

### d. Commission Discrimination

Next, Samson claims Jerr-Dan paid its employees commission on the sale of other products, but not on the SLVR, thereby creating no incentive or a disincentive to market and sell the SLVR.

There is conflicting evidence who, if anyone, received commission on sales of the SLVR. (*See* Pl.'s Ex. 26, Hammond Dep. at 72 (no commission received on sale of one SLVR); Def.'s Ex. R, Aiken Dep. at 40:1 (commission would be received for the sale of an SLVR); Pl.'s Br. Supp. Mot. for Summ. J., at 16 (stating that Paul Saffelle would receive commission for "demonstrations" but not necessarily sales, of the SLVR.) The parties also disagree about whether any commission that may have been received was proportionate to other Jerr-Dan products.

Here again, issues of material fact remain regarding the payment or non-payment of commission, and whether the amount that Jerr-Dan provided to its marketing team was "commercially reasonable." Summary judgment on this ground will be denied.

### 2. Resource Promise

Samson also claims that Jerr-Dan violated Section 8.2 of the License Agreement by failing to "continuously and diligently . . . procure and maintain facilities and trained personnel sufficient and adequate" to "make reasonable commercial efforts to manufacture, advertise, sell and ship" the SLVR consistent with Jerr-Dan's other products. (*See* Licensing Agreement, § 8.2.)

11

Samson's main contention in this regard is that Jerr-Dan did not at all times have anyone exclusively dedicated to demonstrating and marketing the SLVR. In response, Jerr-Dan claims they do not routinely assign individuals to a single product. Thus, a factual question remains as to whether the personnel provided by Jerr-Dan at the relevant times constituted "reasonable commercial efforts" to "procure and maintain facilities and trained personnel sufficient and adequate" to market the SLVR. Summary judgment on this ground will be denied.

### 3. **Territorial Promise**

Samson argues that Jerr-Dan breached the territorial promise contained in the License Agreement which prohibited Jerr-Dan from marketing and selling the SLVR outside the United States. Jerr-Dan concedes it sold the SLVR in the United Kingdom and, therefore, it was a technical breach of the Licensing Agreement but further argues that because royalties were paid, the harm is *de minimus*.

Because this is a motion for partial summary judgment as to liability alone, and Jerr-Dan has conceded it breached the licensing agreement in this regard, summary judgment will be granted to Samson on this claim. Any discussion of damages shall be reserved for a later date. Summary judgment as to liability will be granted.

### 4. **Patent Notice Promise**

Section 5.1 of the Licensing Agreement states, in relevant part:

> [Jerr-Dan] shall not be normally permitted to file for patent protection for an Improvement, provided that in the event that [Jerr-Dan] does file for patent protection for an Improvement, it will promptly notify SAMSON, and [Jerr-Dan] shall promptly assign the ownership of such patent application to SAMSON within thirty (30) days of such filing.

(Pl.'s Ex. 3, Licensing Agreement, § 5.1.)

On December 1, 2005, and July 5, 2007, Jerr-Dan filed patent applications that Samson argues violate Section 5.1 because they relate to "Improvements" on the SLVR. (Pl.'s Br. Supp. Mot. for Summ. J. at 18.) Jerr-Dan counters that the licensing agreement differentiates "Improvements" from "improvements" — the critical distinction here being the capitalization of "i." Jerr-Dan argues that Section 5.1 only requires they provide notice for "Improvements" but that patent applications here only involve "improvements," and thus, no notice need be given.[6] (Def.'s Br. in Opp. to the Mot. for Summ. J. at 27.)

Samson rebuts that it is Jerr-Dan's burden to prove it was not required to give Samson notice of the patent protection application because Samson has no way of proving the application was for an "improvement" and not an "Improvement." (Pl.'s Reply Br. at 25.) The court agrees that Jerr-Dan has the burden of showing they were not required to provide notice under the contract, and therefore, whether the changes Jerr-Dan wishes to have patented were "Improvements" or "improvements" is a factual question for a jury to determine. Therefore, summary judgment will be denied on this ground.

---

[6] Section 1.5 of the Licensing Agreement defines Improvements as "any modifications, *improvements* and/or developments to a product or method or product described or claimed in the SAMSON Patent Rights by either party. (Pl.'s Ex. 3, Licensing Agreement, § 1.5) (emphasis added). The court thus fails to see how an "improvement" would not also be an "Improvement" seeing as it is incorporated in the definition thereof, just as a "modification" would also be an "Improvement" but not necessarily an "improvement." The parties, however, do not address this argument and the court will therefore assume that if Jerr-Dan can prove their patent was for an "improvement" they were not required to provide Samson with notice. (*See* Pl.'s Reply, at 26, "Because of the notice provisions of the License Agreement, to avoid a breach, Jerr-Dan had to determine ***at the time of a patent filing*** whether the filing was a "little I" or "Capital I" improvement, and if it was the latter, it had to give Samson notice.") (emphasis in original.)

**III.     Conclusion**

For the aforementioned reasons, Samson's motion for partial summary judgment as to liability will be denied with regard to the allegations that Jerr-Dan breached the following promises allegedly contained in the License Agreement: the Non-Discrimination Promises, the Resource Promise, and the Patent Notice Promise. The court finds that there are genuine issues of material fact relating to these allegations that must be resolved by a jury.

The court will grant Samson's motion for partial summary judgment as to liability on Samson's Territorial Promise claim in light of Jerr-Dan's concession that it technically violated the terms of the contract when it sold SLVR's in the United Kingdom.

No determination as to damages on any of the claims will be made at this time.

An appropriate order to follow.

                                        s/Sylvia H. Rambo
                                        United States District Judge

Dated:  August 11, 2011.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**SAMSON LIFT TECHNOLOGIES, LLC,**
        **Plaintiff**

v.

**JERR-DAN CORPORATION,**
        **Defendant**

: Civ. No. 09-1590

: J. RAMBO

## O R D E R

For the reasons stated in the accompanying memorandum of law, it is **HEREBY ORDERED** that, Plaintiff's motion for partial summary judgment on liability (Doc. 72) is:

    1) **GRANTED** with respect to Jerr-Dan's violation of the Territorial Promise claim;

    2) **DENIED** in all other regards.

A separate scheduling order will issue.

                                             s/Sylvia H. Rambo
                                            United States District Judge

Dated: August 11, 2011.